Filed 11/6/19 (unmodified opinion attached)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| YAZMIN BROWN et al., | B280550 |
| Plaintiffs and Appellants. | (Los Angeles County Super. Ct. No. BC599321) |
| v. | |
| USA TAEKWONDO et al., | ORDER MODIFYING OPINION AND DENYING PETITION FOR REHEARING |
| Defendants and Respondents. | |
| | NO CHANGE IN APPELLATE JUDGMENT |

THE COURT:*

The above-entitled opinion filed on October 8, 2019 is modified as follows:

On pages 35 to 36, delete the text of footnote 11 and replace it with the following.

On September 12, 2018 plaintiffs requested judicial notice of two May 21, 2018 congressional staff memoranda and a videotape of a May 23, 2018 congressional hearing concerning the sexual abuse of athletes in Olympic sports, including taekwondo. We

denied plaintiffs' request without prejudice because it failed to comply with California Rules of Court, rule 8.252(a)(2). On August 26, 2019 plaintiffs renewed their request for judicial notice of the same information. We deny plaintiffs' renewed request for judicial notice on the basis the documents and videotape are not necessary for our resolution of the appeal because USOC's knowledge of sexual abuse by Olympic coaches is not sufficient to create a special relationship with taekwondo coaches or athletes. (See *Jordache Enterprises, Inc. v. Brobeck, Phleger & Harrison* (1998) 18 Cal.4th 739, 748, fn. 6 [judicial notice denied where "the requests present no issue for which judicial notice of these items is necessary, helpful, or relevant"]; *Appel v. Superior Court* (2013) 214 Cal.App.4th 329, 342, fn. 6 [judicial notice denied where materials are not "relevant or necessary" to the court's analysis].) Nor is the testimony at the hearing or asserted Congressional "ire" over the failure of USOC to protect Olympic athletes relevant to whether we grant leave to amend to allege a special relationship between USOC and Gitelman or plaintiffs. As discussed, USOC's ability to regulate Gitelman's conduct was principally through its control of USAT as the national governing body for the sport of taekwondo. Although USOC gained additional authority as a result of the 2018 amendment of the Ted Stevens Olympic and Amateur Sports Act (36 U.S.C. § 220501 et seq.), we need not reach the scope of USOC's additional authority because it is not relevant to USOC's power to prevent Gitelman's alleged sexual abuse during the period from 2007 to 2013. We therefore deny plaintiffs' request for leave to amend to allege USOC owed a duty to plaintiffs. We also deny USOC's and USAT's motions to strike the portions of plaintiffs' reply brief

that reference the documents attached to their request for judicial notice. Instead, we have not considered the cited May 2018 congressional testimony in our analysis.

Appellants' petition for rehearing is denied. There is no change in the appellate judgment.

---

\* PERLUSS, P. J.      ZELON, J.      FEUER, J.

Filed 11/4/19 (unmodified opinion attached)
**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| YAZMIN BROWN et al., | B280550 |
| Plaintiffs and Appellants. | (Los Angeles County Super. Ct. No. BC599321) |
| v. | |
| USA TAEKWONDO et al., | ORDER MODIFYING OPINION AND DENYING PETITION FOR REHEARING |
| Defendants and Respondents. | |
| | NO CHANGE IN JUDGMENT |

THE COURT:*

The above-entitled opinion filed on October 8, 2019 is modified as follows:

On pages 35 to 36, delete the text of footnote 11 and replace it with the following.

On September 12, 2018 plaintiffs requested judicial notice of two May 21, 2018 congressional staff memoranda and a videotape of a May 23, 2018 congressional hearing concerning the sexual abuse of athletes in Olympic sports, including taekwondo. We

denied plaintiffs' request without prejudice because it failed to comply with California Rules of Court, rule 8.252(a)(2). On August 26, 2019 plaintiffs renewed their request for judicial notice of the same information. We deny plaintiffs' renewed request for judicial notice on the basis the documents and videotape are not necessary for our resolution of the appeal because USOC's knowledge of sexual abuse by Olympic coaches is not sufficient to create a special relationship with taekwondo coaches or athletes. (See *Jordache Enterprises, Inc. v. Brobeck, Phleger & Harrison* (1998) 18 Cal.4th 739, 748, fn. 6 [judicial notice denied where "the requests present no issue for which judicial notice of these items is necessary, helpful, or relevant"]; *Appel v. Superior Court* (2013) 214 Cal.App.4th 329, 342, fn. 6 [judicial notice denied where materials are not "relevant or necessary" to the court's analysis].) Nor is the testimony at the hearing or asserted Congressional "ire" over the failure of USOC to protect Olympic athletes relevant to whether we grant leave to amend to allege a special relationship between USOC and Gitelman or plaintiffs. As discussed, USOC's ability to regulate Gitelman's conduct was principally through its control of USAT as the national governing body for the sport of taekwondo. Although USOC gained additional authority as a result of the 2018 amendment of the Ted Stevens Olympic and Amateur Sports Act (36 U.S.C. § 220501 et seq.), we need not reach the scope of USOC's additional authority because it is not relevant to USOC's power to prevent Gitelman's alleged sexual abuse during the period from 2007 to 2013. We therefore deny USOC's request for leave to amend to allege USOC owed a duty to plaintiffs. We also deny USOC's and USAT's motions to strike the portions of plaintiffs' reply brief

that reference the documents attached to their request for judicial notice. Instead, we have not considered the cited May 2018 congressional testimony in our analysis.

Appellants' petition for rehearing is denied. There is no change in the judgment.

---

\* PERLUSS, P. J.        ZELON, J.        FEUER, J.

Filed 10/8/19 (unmodified version)
**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| YAZMIN BROWN et al., | B280550 |
| Plaintiffs and Appellants, | (Los Angeles County Super. Ct. No. BC599321) |
| v. | |
| USA TAEKWONDO et al., | |
| Defendants and Respondents. | |

APPEAL from the judgments of the Superior Court of Los Angeles County, Michael P. Vicencia, Judge. Affirmed in part; reversed in part and remanded.

Estey & Bomberger, Stephen J. Estey; Corsiglia McMahon & Allard, B. Robert Allard; Williams Iagmin and Jon R. Williams for Plaintiffs and Appellants.

Kjar, McKenna, Stockalper, Patrick E. Stockalper and Mina M. Morkos for Defendant and Respondent USA Taekwondo.

Clyde & Co., Douglas J. Collodel, Margaret M. Holm and M. Christopher Hall for Defendant and Respondent United States Olympic Committee.

Plaintiffs Brianna Bordon, Yazmin Brown, and Kendra Gatt filed this action against their taekwondo coach, Marc Gitelman, the United States Olympic Committee (USOC), USA Taekwondo (USAT), and others arising from Gitelman's sexual abuse of the then 15- and 16-year-old plaintiffs leading up to Gitelman's arrest and later felony convictions. Plaintiffs appeal from a judgment of dismissal entered after the trial court sustained without leave to amend the demurrers filed by USOC and USAT to plaintiffs' first amended complaint alleging causes of action for negligence, negligent hiring and retention, and negligent and intentional infliction of emotional distress.

On appeal, plaintiffs contend USOC and USAT are liable for negligence because the organizations failed to protect plaintiffs from Gitelman's sexual abuse. We conclude USAT, which is the national governing body for the Olympic sport of taekwondo, had a special relationship with Gitelman because Gitelman was required to register with USAT to coach taekwondo at USAT-sponsored competitions, athletes could only compete in competitions with registered coaches, USAT could (and later did) implement policies and procedures to protect athletes from sexual abuse by their coaches, and USAT could (and later did) bar Gitelman from coaching athletes at taekwondo competitions for his violations of USAT's policies and procedures. USAT was therefore in a unique position to protect taekwondo youth athletes from harm.[1] Our examination of the *Rowland*[2] factors supports a finding on the alleged facts that USAT had a duty to implement and enforce policies and procedures to protect youth athletes from foreseeable sexual abuse by their coaches. Because

[1] By "youth athletes" we mean athletes who are minors.

[2] *Rowland v. Christian* (1968) 69 Cal.2d 108, 113 (*Rowland*).

2

USAT demurred on the direct negligence cause of action based solely on the lack of a duty of care, we reverse the trial court's dismissal of this cause of action against USAT.

By contrast, USOC did not owe a duty to plaintiffs because it did not have a special relationship with Gitelman or plaintiffs. Although USOC had the ability to control USAT, including requiring it to adopt policies to protect youth athletes, it did not have direct control over the conduct of coaches.

Plaintiffs also assert USOC and USAT are vicariously liable for Gitelman's sexual abuse based on theories of joint venture, respondeat superior, and ratification. But plaintiffs cannot maintain their derivative claims because the facts as alleged do not establish Gitelman was in a joint venture or had an agency or employment relationship with either USOC or USAT. Plaintiffs also fail to allege facts sufficient to state a claim for the intentional infliction of emotional distress.

We affirm the judgment dismissing USOC from the action. We reverse the judgment of dismissal as to USAT and remand for further proceedings consistent with this opinion.

## FACTUAL AND PROCEDURAL BACKGROUND

A. *The First Amended Complaint*

Plaintiffs filed this action on October 29, 2015. On October 7, 2016 plaintiffs filed the operative first amended complaint against Gitelman, USOC, USAT, NV Taekwondo Training and Fitness Center (NVT), Latin American

International Taekwondo Federation, Ltd. (LAITF), and California Unified Taekwondo Association (CUTA).[3]

### 1. *The parties*

Plaintiffs were 15- and 16-year-old female taekwondo athletes who were coached by Gitelman. Gitelman was the owner or employee of NVT in Las Vegas, Nevada, but resided in California. Plaintiffs allege USOC has exclusive authority to certify or decertify national governing bodies for Olympic sports in the United States. USOC certified 49 national governing bodies in the United States. As the national governing body for the Olympic sport of taekwondo, USAT requires athletes to be members of USAT and to train under coaches registered with USAT. As alleged, USAT "formulates the rules and implements the policies and procedures for local taekwondo studios throughout the United States and is further responsible for overseeing and enforcing the [c]ode of [e]thics for the sport of taekwondo." USOC and USAT sponsored and promoted taekwondo competitions attended by plaintiffs and Gitelman.[4]

---

[3]     The factual background includes the facts as alleged in the first amended complaint. Plaintiffs allege LAITF is the USAT state association for Nevada, and CUTA is the USAT state association for California. Only USOC and USAT are parties to this appeal.

[4]     Plaintiffs allege the defendant organizations, including USOC, USAT, NVT, LAITF, and CUTA, acted as the agents and employees of each other, were engaged in a joint venture, all promoted and benefitted from Olympic sports, and had knowledge of sexual abuse in Olympic sports. For simplicity, we focus on the allegations against USOC and USAT.

4

2. *USOC's and USAT's prior knowledge of sexual abuse in Olympic sports, including taekwondo, and USAT's adoption of a safe sport program*

Plaintiffs allege that since at least the 1980's USOC had actual knowledge that numerous female athletes were raped at the Olympic training centers in Marquette, Michigan; Colorado Springs, Colorado; and Lake Placid, New York. In 1992 the USAT delegation was evicted from their rented house in Barcelona after the Spanish landlord walked in on the national team coach having sex with a young female Olympian. Plaintiffs allege upon information and belief sexual molestation of youth athletes by coaches credentialed by national governing bodies was so rampant that by 1999 USOC required all national governing bodies to have insurance to cover sexual abuse by coaches. In 1999 USAT purchased sexual abuse insurance. In 2007 Gary Johanson, a USOC employee, knew of at least one rape of a female taekwondo youth athlete at the Olympic training center in Colorado Springs.

Plaintiffs allege further, "By 2007 sexual abuse of minors by figures of authorities, like priests, coaches, and scout leaders was a widely known risk in American society. Plaintiffs are informed and believe and thereon allege that at all times herein mentioned, defendants USOC, CUTA, NVT, LAITF, and USAT were aware that female taekwondo athletes, and Olympian level athletes in general were frequently victims of sexual molestation by their coaches yet did nothing to protect these athletes from such abuse. Plaintiffs are informed and believe and thereon allege that defendants regularly received complaints from athletes or their parents regarding improper sexual conduct by coaches and that these complaints were discussed in 'executive

5

sessions' of defendants USOC, CUTA, NVT, LAITF, and USAT various boards of directors."

In 2010 a USOC task force required all national governing bodies to adopt a "safe sport program" by 2013 to protect athletes from sexual abuse.  USAT failed to adopt a safe sport program by the deadline.  USOC placed USAT on probation in 2011 because of alleged self-dealing among USAT's board members, and USAT remained on probation through September 2013 because of its failure to adopt a safe sport program.

In the late summer of 2013 USAT adopted a code of conduct and code of ethics that complied with USOC's requirements for a safe sport program.  USAT's code of conduct prohibits sexual relationships between coaches and athletes regardless of the athlete's age.  USAT's code of ethics prohibits sexual harassment, including requests for sexual favors; provision of alcohol to an athlete under the age of 18 or abuse of alcohol by a coach in a minor's presence; inappropriate touching between a coach and an athlete, including excessive touching, hugging, kissing, sexually orientated behavior, and sexually stimulating or otherwise inappropriate games; rubdowns and massages by an adult other than a licensed massage therapist; and any nonconsensual physical contact.  After USAT adopted its codes of conduct and ethics, USOC lifted USAT's probationary status.

3.      *Gitelman's sexual abuse of plaintiffs*

In June 2007 then 15-year-old Bordon attended a taekwondo event with Gitelman in Fresno, California "sanctioned" by USOC and USAT.  Gitelman invited Bordon to his hotel room for the stated purpose of reviewing videos of her prior fights, but instead sexually molested her.  In May 2008

6

Gitelman drove Bordon from Nevada to a competition in the City of Industry, California, also sanctioned by USOC and USAT. During the drive, Gitelman made Bordon rub his penis and perform oral sex. At the hotel, Gitelman invited Bordon to his room to review videos of Bordon's previous fights. When Bordon entered the hotel room, Gitelman gave her a glass of alcohol, then sexually molested her. In January 2009 Gitelman sexually molested Bordon at the Olympic training center dormitory in Colorado Springs.[5] Gitelman continued to sexually molest Bordon at taekwondo events sanctioned by USOC and USAT from 2007 until the time Bordon left competitive taekwondo in 2010.

In March or May 2010, Gitelman and his students, then 15-year-old Gatt and 16-year-old Brown, attended a taekwondo competition in the City of Industry sanctioned by USOC and USAT. Gitelman invited Brown, Gatt, and a third young woman to his hotel room. He served alcohol to Brown and Gatt and had them play a drinking game called "left, right, left," causing them to become intoxicated. After Brown became drunk and lay down on the bed, Gitelman lifted her shorts and began to sexually molest her. After Gatt walked Brown to her hotel room, Gatt returned to Gitelman's hotel room, where he gave her more alcohol. Gitelman later instructed Gatt to lie down on the bed, and he sexually molested her. In 2010 Gitelman continued to

---

[5]   Plaintiffs allege on information and belief USOC owned the Olympic training center dormitory. At some unspecified time prior to 2005, a female USAT youth athlete was raped at the training center. In response, USOC placed a guard outside the girls' dormitory, but sometime between 2005 and 2009 USOC stopped placing guards at the dormitory.

provide Gatt with alcohol and to sexually molest her on the premises of NVT.

From November 11 to 13, 2011 Brown competed in the Rocky Mountain Open at the Olympic training center in Colorado Springs, an event sanctioned by USOC and USAT. Brown and Gitelman stayed in separate dormitory rooms. On November 11 Gitelman invited Brown to his dormitory room ostensibly to check on an injury she had sustained during the competition. Gitelman then sexually abused Brown in his dormitory room. Plaintiffs allege "from 2010 through the time [Brown] ceased contact with defendant [Gitelman] in 2013," Gitelman continued to sexually molest Brown at events sanctioned by USOC and USAT.[6]

Plaintiffs allege Gitelman did not hide his relationships with them. He "openly carried on relationships with each [p]laintiff and his relationship with each plaintiff was common knowledge throughout the sport of taekwondo." Plaintiffs allege USOC and USAT knew or should have known Gitelman was

_____

[6] Plaintiffs allege on information and belief Gitelman continued to abuse plaintiffs through the time of his arrest in August 2014. However, plaintiffs allege Gitelman's sexual abuse of Bordon and Gatt ended in 2010, and his sexual abuse of Brown ended sometime in 2013. "[S]pecific allegations in a complaint control over an inconsistent general allegation." (*Perez v. Golden Empire Transit Dist.* (2012) 209 Cal.App.4th 1228, 1236; accord, *Ferrick v. Santa Clara University* (2014) 231 Cal.App.4th 1337, 1352; but see *Daniels v. Select Portfolio Servicing, Inc.* (2016) 246 Cal.App.4th 1150, 1171 [declining to apply principle that specific allegations control because general agency allegations had sufficient detail and were consistent with specific allegations].)

violating the code of ethics based on the behavior of Gitelman and plaintiffs displayed in public and at competitions.

USOC and USAT did not have any policies, procedures, or oversight to enforce the code of ethics or prevent sexual assaults of athletes. Specifically, they "did not have any policies in place prohibiting coaches from traveling alone to competitions with minor athletes and did not have policies prohibiting coaches from staying in hotel rooms with minor athletes." They also did not have guards or chaperones at hotels, dormitories, or competitions to enforce the code of ethics or to prevent improper contact between coaches and athletes.

### 4. *USOC's and USAT's knowledge in 2013 of Gitelman's sexual abuse of plaintiffs*

Plaintiffs allege by September 2013 Malia Arrington, the USOC director of ethics and safe sport, had actual knowledge of plaintiffs' allegations against Gitelman. In October 2013 USAT chief executive officer Bruce Harris and USAT ethics committee chair Don Parker voted to suspend Gitelman pending a hearing by the USAT ethics committee. USAT's board of directors approved the temporary suspension of Gitelman pending the hearing. At the USAT ethics committee hearing, then 18-year-old Brown represented herself, while Gitelman was represented by an attorney. Following the ethics committee hearing, the hearing panel recommended termination of Gitelman's USAT membership. But USAT board president Devin Johnson allegedly refused to present the ethics committee finding to the full board of directors. USAT allowed Gitelman to continue coaching at competitions, including the USA Open Taekwondo Competition in 2014. Arrington and USOC had actual knowledge

9

Gitelman was still coaching in 2014 notwithstanding the USAT hearing panel's recommendation to terminate his USAT membership. USAT did not place Gitelman on its list of banned coaches until September 2015. At some point Gitelman was convicted of multiple felonies for the sexual abuse of Bordon, Brown, and Gatt.

### 5. *Plaintiffs' causes of action*

The first three causes of action for assault and battery are alleged against Gitelman and unnamed individuals for Gitelman's criminal conduct against Bordon, Brown, and Gatt. The remaining five causes of action allege negligence, negligent hiring and retention, and negligent and intentional infliction of emotional distress against USOC, USAT, and the other defendants.

Plaintiffs' fourth cause of action for negligence alleges USOC and USAT are responsible for Gitelman's negligent conduct because, on information and belief, Gitelman "was acting as the agent and/or employee of, and otherwise under the control of or regulated by" USOC and USAT and "was acting in the course and within the scope of his authority as agent and/or employee, actual or ostensible . . . ." In addition, on information and belief, Gitelman "was acting as an officer, director and/or managing agent for or otherwise regulated and/or controlled by" USOC and USAT.

Plaintiffs' fifth cause of action for negligence alleges USOC and USAT were directly liable because they breached their "duty of reasonable care to enforce or enact a [c]ode of [e]thics for the sport of taekwondo and to enact policies and procedures both to

enforce the [c]ode and to protect female athletes from sexual assault and molestation by coaches and persons in authority."

Plaintiffs' sixth cause of action for negligent hiring and retention alleges USOC and USAT breached the duty of care they owed to plaintiffs by "failing to conduct a thorough background check on defendant [Gitelman] when they hired him, failing to act upon information that defendant [Gitelman] had a history of and propensity for inappropriate acts/sexual abuse of athletes and allowing him to have unfettered access to vulnerable athletes, including plaintiffs."

Plaintiffs' seventh cause of action for the intentional infliction of emotional distress alleges the conduct of USOC and USAT "was intentional and malicious, and done for the purpose of causing plaintiffs to suffer humiliation, mental anguish and emotional and physical distress." As a proximate result of defendants' acts, "plaintiffs suffered humiliation, mental anguish, and emotional and physical distress, and have been injured in their mind and body . . . ."

Finally, plaintiffs' eighth cause of action for negligent infliction of emotional distress against all defendants alleges, "In committing the acts as herein alleged, defendants . . . knew, or in the exercise of reasonable care should have known, that their failure to exercise due care would cause plaintiffs severe emotional distress."

Plaintiffs allege that as a direct and proximate result of the negligence of USOC and USAT, plaintiffs sustained special and noneconomic damages, including pain, suffering, and emotional distress. Plaintiffs also allege, "Each of these defendants have known or should have known for literally years not only about defendant [Gitelman's] prior sexual misconduct, but also the

11

pervasive problem with other taekwondo coaches or high level executives dating or molesting underage female athletes and yet have done little if anything about it.  Thus, each said defendant is guilty of malice and oppression, and in addition to compensatory damages, punitive damages should be awarded for the sake of example and by way of punishing each said defendant."  Plaintiffs also seek punitive damages with respect to their claims for the intentional and negligent infliction of emotional distress for USOC's and USAT's "willful, wanton, malicious and oppressive" conduct and acts in "conscious disregard of [plaintiffs'] rights and safety."

B.    *USOC's and USAT's Demurrers and Motions To Strike Portions of the First Amended Complaint*

USOC and USAT each filed a demurrer to the first amended complaint, arguing the causes of action were uncertain and did not allege facts sufficient to state a claim.  As to vicarious liability, USOC and USAT argued plaintiffs did not allege any facts to establish Gitelman was an employee or agent, or he committed the sexual assaults within the course and scope of his employment or agency.  USOC and USAT also argued they could not be held vicariously liable because they did not have actual knowledge of Gitelman's sexual misconduct.

USOC and USAT asserted plaintiffs had not alleged a claim for negligence based on a theory of direct liability because the organizations owed no duty of care to plaintiffs to prevent Gitelman's sexual abuse.  They contended plaintiffs failed to allege a special relationship and actual knowledge of Gitelman's prior sexual misconduct.  USOC also argued plaintiffs failed to

12

plead facts sufficient to establish it owed a duty of care under the *Rowland* factors.

USOC and USAT asserted plaintiffs' claim for negligent infliction of emotional distress was duplicative of the negligence causes of action.  Finally, USOC and USAT argued plaintiffs failed to allege facts sufficient to support a claim for the intentional infliction of emotional distress because the alleged conduct was not extreme, outrageous, or reckless.

USOC and USAT separately filed motions to strike plaintiffs' allegations seeking punitive damages and attorneys' fees.

C.    *The Trial Court's Ruling and Entry of Judgment*

On November 29, 2016 the trial court held a hearing on the demurrers and motions to strike filed by USOC and USAT.  The court sustained the demurrers without leave to amend, finding "Gitelman was not an employee or agent of either of the defendants and the facts alleged do not make him one."[7]  In addition, the court ruled the motions to strike were moot because it had sustained the demurrers.  On January 3, 2017 the trial court entered judgments of dismissal in favor of USOC and USAT.  Plaintiffs timely appealed.

---

[7]    On our own motion we augment the record to include the trial court's November 19, 2016 minute order.  (Cal. Rules of Court, rule 8.155(a)(1)(A).)  There is no record of the court's ruling other than the minute order and judgment of dismissal.

13

**DISCUSSION**

A. *Standard of Review*

"In reviewing an order sustaining a demurrer, we examine the operative complaint de novo to determine whether it alleges facts sufficient to state a cause of action under any legal theory. [Citation.]  Where the demurrer was sustained without leave to amend, we consider whether the plaintiff could cure the defect by an amendment." (*T.H. v. Novartis Pharmaceuticals Corp.* (2017) 4 Cal.5th 145, 162; accord, *Centinela Freeman Emergency Medical Associates v. Health Net of California, Inc.* (2016) 1 Cal.5th 994, 1010.)  When evaluating the complaint, "we assume the truth of the allegations." (*Lee v. Hanley* (2015) 61 Cal.4th 1225, 1230; accord, *McCall v. PacifiCare of Cal., Inc.* (2001) 25 Cal.4th 412, 415.)

"A judgment of dismissal after a demurrer has been sustained without leave to amend will be affirmed if proper on any grounds stated in the demurrer, whether or not the court acted on that ground." (*Carman v. Alvord* (1982) 31 Cal.3d 318, 324; accord, *Summers v. Colette* (2019) 34 Cal.App.5th 361, 367.)

A trial court abuses its discretion by sustaining a demurrer without leave to amend where "'there is a reasonable possibility that the defect can be cured by amendment.'" (*Loeffler v. Target Corp.* (2014) 58 Cal.4th 1081, 1100; accord, *City of Dinuba v. County of Tulare* (2007) 41 Cal.4th 859, 865.)  "'The plaintiff has the burden of proving that [an] amendment would cure the legal defect, and may [even] meet this burden [for the first time] on appeal.'" (*Sierra Palms Homeowners Assn. v. Metro Gold Line Foothill Extension Construction Authority* (2018) 19 Cal.App.5th

14

1127, 1132; accord, *Aubry v. Tri-City Hospital Dist.* (1992) 2 Cal.4th 962, 971.)

B. *Plaintiffs Have Alleged Facts Sufficient To State a Claim for Negligence Based on the Duty of Care Owed to Plaintiffs by USAT, but Not USOC*

Plaintiffs' fifth cause of action for negligence is based on USOC's and USAT's breach of a duty of care owed to plaintiffs. As discussed, plaintiffs allege USOC and USAT "had a duty of reasonable care to enforce or enact a [c]ode of [e]thics for the sport of taekwondo and to enact policies and procedures both to enforce the [c]ode and to protect female athletes from sexual assault and molestation by coaches and persons in authority." In their demurrers USOC and USAT asserted they did not owe plaintiffs a duty of care. We conclude USAT owed plaintiffs a duty of care, but USOC did not.

1. *Duty of Care*

To support a claim for negligence, a plaintiff must allege facts showing a legal duty to use due care, breach of the duty, causation, and damages. (*Regents of University of California v. Superior Court* (2018) 4 Cal.5th 607, 618 (*Regents*); *Vasilenko v. Grace Family Church* (2017) 3 Cal.5th 1077, 1083 (*Vasilenko*).)[8]

---

[8] Our analysis of plaintiffs' negligence claims also applies to their claim for negligent infliction of emotional distress. "[T]here is no independent tort of negligent infliction of emotional distress. [Citation.] The tort is negligence, a cause of action in which a duty to the plaintiff is an essential element." (*Potter v. Firestone Tire & Rubber Co.* (1993) 6 Cal.4th 965, 984; accord, *Jackson v. Mayweather* (2017) 10 Cal.App.5th 1240, 1266, fn. 11; *Brandwein v. Butler* (2013) 218 Cal.App.4th 1485, 1520

15

"In general, each person has a duty to act with reasonable care under the circumstances."  (*Regents*, at p. 619; accord, *Vasilenko*, at p. 1083 ["Civil Code section 1714, subdivision (a) 'establishes the general duty of each person to exercise, in his or her activities, reasonable care for the safety of others.'"].)  "However, 'one owes no duty to control the conduct of another, nor to warn those endangered by such conduct.'"  (*Regents*, at p. 619; accord, *Delgado v. Trax Bar & Grill* (2005) 36 Cal.4th 224, 235 (*Delgado*) ["as a general matter, there is no duty to act to protect others from the conduct of third parties"].)

Nevertheless, "a duty to control may arise if the defendant has a special relationship with the foreseeably dangerous person that entails an ability to control that person's conduct."  (*Regents, supra,* 4 Cal.5th at p. 619; accord, *Barenborg v. Sigma Alpha Epsilon Fraternity* (2019) 33 Cal.App.5th 70, 77 (*Barenborg*).)  "Similarly, a duty to warn or protect may be found if the defendant has a special relationship with the potential victim that gives the victim the right to expect protection."  (*Regents*, at p. 619; accord, *Delgado, supra*, 36 Cal.4th at p. 235 ["A defendant may owe an affirmative duty to protect another from the conduct of third parties if he or she has a 'special relationship' with the other person."].)  "The existence of a duty is a question of law, which we review de novo."  (*Vasilenko, supra*, 3 Cal.5th at p. 1083 [analyzing duty under *Rowland* factors]; accord, *Regents*, at p. 620 ["The determination whether a particular relationship supports a duty of care rests on policy and is a question of law."].)

---

["[R]ecovery of emotional distress damages is premised on defendant's negligence (i.e., breach of duty) that proximately causes emotional distress."].)

16

"[P]lantiffs alleging a defendant had a duty to protect them must establish: (1) that an exception to the general no-duty-to-protect rule applies *and* (2) that the *Rowland* factors support the imposition of the duty." (*Barenborg, supra*, 33 Cal.App.5th at p. 77; see *Regents, supra*, 4 Cal.5th at p. 628 [applying *Rowland* factors after concluding college had special relationship with students engaged in college's curricular activities]; *Delgado, supra*, 36 Cal.4th at pp. 244-246 [bar proprietor had duty to protect patron from assault by third party based on special relationship with patron and *Rowland* factors].)

"'"The key in each [special relationship] is that the defendant's relationship with . . . the tortfeasor . . . places the defendant in the best position to protect against the risk of harm."'" [Citations.] Thus, the defendant's ability to control the person who caused the harm must be such that 'if exercised, [it] would meaningfully reduce the risk of the harm that actually occurred."'" (*Barenborg, supra*, 33 Cal.App.5th at p. 78.)

In *Regents*, the Supreme Court considered the "common features" of a special relationship. (*Regents, supra*, 4 Cal.5th at p. 620.) The *Regents* court observed that "[g]enerally, the relationship has an aspect of dependency in which one party relies to some degree on the other for protection." (*Ibid*.) Further, "[t]he corollary of dependence in a special relationship is control. Whereas one party is dependent, the other has superior control over the means of protection. '[A] typical setting for the recognition of a special relationship is where "the plaintiff is particularly vulnerable and dependent upon the defendant who, correspondingly, has some control over the plaintiff's welfare."'" (*Id*. at p. 621.) In addition, "[s]pecial relationships also have defined boundaries. They create a duty of care owed to a limited

17

community, not the public at large." (*Ibid*.)  Finally, the court noted that "although relationships often have advantages for both participants, many special relationships especially benefit the party charged with a duty of care," pointing to retail stores and hotels as examples.  (*Ibid*.)

In its evaluation of whether a college has a special relationship with its students, the *Regents* court observed that college students are "dependent on their college communities to provide structure, guidance, and a safe learning environment" and "have superior control over the environment and the ability to protect students." (*Regents, supra*, 4 Cal.5th at p. 625.)  The court reasoned, "Considering the unique features of the college environment, we conclude postsecondary schools *do* have a special relationship with students while they are engaged in activities that are part of the school's curriculum or closely related to its delivery of educational services." (*Id*. at pp. 624-625.)  However, the court limited the college's duty of care to "activities that are tied to the school's curriculum but not to student behavior over which the university has no significant control," explaining the college would be expected to retain a "measure of control" over the classroom environment.  (*Id*. at p. 627.)

A number of Courts of Appeal have considered whether organizations owe a duty of care toward a minor where an adult under the control of the organization sexually abused the minor. In *Doe v. United States Youth Soccer Assn., Inc.* (2017) 8 Cal.App.5th 1118, 1130-1131 (*United States Youth Soccer*), the court concluded the national youth soccer association had a special relationship with the 12-year-old plaintiff who was sexually abused by her coach.  The court reasoned there was a

special relationship because the plaintiff was a member of the association, she played on a team that was a local affiliate of the association, the team was required to comply with the association's policies and rules, and the association established the standards under which coaches were hired. (*Id.* at p. 1131.) The court explained, "[P]arents entrusted their children to [the association and other] defendants with the expectation that they would be kept physically safe and protected from sexual predators while they participated in soccer activities." (*Id.* at p. 1130.)

Similarly, in *Juarez v. Boy Scouts of America, Inc.* (2000) 81 Cal.App.4th 377, 404 (*Juarez*), the Court of Appeal concluded the Boy Scouts of America had a duty to protect a 12-year-old scout who was sexually molested by his scoutmaster during officially sanctioned scouting events, including overnight campouts. In its review of the record on summary judgment, the court observed the Boy Scouts had identified the protection of youth from sexual abuse as a priority of the organization. (*Id.* at p. 398.) The Boy Scouts had developed a "Youth Protection Program" to educate adult volunteers, parents, and scouts on how to detect and prevent sexual abuse, but it had failed to provide information to the plaintiff and his parents in their native language on how to protect the plaintiff from sexual abuse. (*Id.* at pp. 398-399.) On these facts the court concluded the Boy Scouts had a special relationship with the plaintiff "giving rise to a duty to protect him from harm caused by the criminal conduct of third parties." (*Id.* at p. 411.)[9]

---

[9] As we discuss below, the court in *Juarez* principally focused on the *Rowland* factors in determining the Boy Scouts owed a duty of care to the plaintiff scout.

19

Other courts have similarly found a special relationship between an organization and the minor or tortfeasor. (See *Conti v. Watchtower Bible & Tract Society of New York, Inc.* (2015) 235 Cal.App.4th 1214, 1235 (*Conti*) [church elders' control over church-sponsored field service placed the church and its elders in a special relationship with plaintiff and the church member who sexually molested plaintiff]; *Doe 1 v. City of Murrieta* (2002) 102 Cal.App.4th 899, 918 (*City of Murrieta*) [police department that sponsored "explorer program" was in special relationship with the teenage explorers and owed them "a duty of care to protect them from foreseeable harm," including from sexual relationship with police officer who served as adviser during ride-alongs at night]; cf. *Barenborg, supra*, 33 Cal.App.5th at pp. 75, 81 [national fraternity did not have special relationship with its local chapter and therefore had no duty to protect student who was injured at party held by local chapter, despite national fraternity's adoption of policies governing local chapter and ability to discipline chapter for policy violations because it had no ability to prevent injury].)

### 2. *Plaintiffs allege facts showing USAT had a special relationship with Gitelman*

Plaintiffs allege facts sufficient to show USAT had a special relationship with Gitelman. To compete at the Olympic games, taekwondo athletes must be members of USAT and train under USAT-registered coaches. USAT registered Gitelman as a coach, and he remained registered until USAT banned him from coaching. USAT had control over Gitelman's conduct through its policies and procedures. As the national governing body of taekwondo, "USAT is responsible for the conduct and

20

administration of taekwondo in the United States."  Further, USAT formulates the rules, implements the policies and procedures, and enforces the code of ethics for taekwondo in the United States.

In the late summer of 2013 USAT adopted codes of conduct and ethics that complied with the requirements of the safe sport program mandated by USOC.  USAT's code of conduct prohibits sexual relationships between coaches and athletes.  USAT's code of ethics prohibits, among other things, provision of alcohol to youth athletes, inappropriate touching between a coach and an athlete, and nonconsensual physical contact.  USAT can, and did, enforce its policies and procedures by temporarily suspending Gitelman pending the ethics committee hearing, conducting a hearing in October 2013 on Brown's sexual abuse allegations against Gitelman, and terminating Gitelman's USAT membership in September 2015.

USAT was therefore ""'in the best position to protect against the risk of harm'"" and "'meaningfully reduce the risk of the harm that actually occurred.'"  (*Barenborg, supra*, 33 Cal.App.5th at p. 78; accord, *Regents, supra*, 4 Cal.5th at p. 621.)  Thus, USAT had "a special relationship with the foreseeably dangerous person that entails an ability to control that person's conduct." (*Regents*, at p. 619; see *United States Youth Soccer, supra*, 8 Cal.App.5th at pp. 1130-1131; *Conti, supra*, 235 Cal.App.4th at p. 1235.)

The facts alleged here contrast with those at issue in *Barenborg, supra*, 33 Cal.App.5th at pages 77 to 80.  There, the Court of Appeal concluded "the existence of general policies governing the operation of local chapters [of a fraternity] and the authority to discipline them for violations does not justify

21

imposition of a duty on national fraternities." (*Id*. at p. 79.) As the court explained, regardless of the national fraternity's policies and ability to discipline the local chapter, it could not have prevented the local chapter from constructing the dangerous platform from which the plaintiff fell during the party. (*Id*. at p. 81.) The court concluded, "Ultimately, regardless of its policies and disciplinary powers, [the national fraternity] was unable to monitor and control [the local chapter's] day-to-day operations, and it thus owed no duty to protect [plaintiff] from [the local chapter's] conduct." (*Ibid*.)

Unlike the national fraternity in *Barenborg*, which could only control its local chapter by disciplining it after learning of a violation of the fraternity's policies, USAT was in a unique position to protect youth athletes against the risk of sexual abuse by their coaches. USAT could, and eventually did, establish codes of conduct and ethics that prohibited sexual relationships between coaches and athletes, inappropriate touching, and nonconsensual physical contact. In addition, as alleged by plaintiffs, USAT could have taken additional steps to protect youth athletes by prohibiting coaches from traveling alone to competitions with youth athletes, barring coaches from staying in hotel rooms at competitions with youth athletes, and providing guards or chaperones at hotels and dormitories at competitions to prevent improper conduct by coaches.

3. *The* Rowland *factors support a finding USAT had a duty to protect plaintiffs from sexual abuse*

Even if an organization has a special relationship with the tortfeasor or plaintiff, "[t]he court may depart from the general rule of duty . . . if other policy considerations clearly require an

22

exception." (*Regents, supra*, 4 Cal.5th at p. 628.) We therefore consider the *Rowland* factors "that may, on balance, justify excusing or limiting a defendant's duty of care." (*Regents*, at p. 628; accord, *United States Youth Soccer, supra*, 8 Cal.App.5th at p. 1128 ["In cases involving nonfeasance and a special relationship between a plaintiff and a defendant, courts have balanced the policy factors set forth in *Rowland, supra*, 69 Cal.2d 108 to assist in their determination of the existence and scope of a defendant's duty in a particular case."]; *Doe v. Superior Court* (2015) 237 Cal.App.4th 239, 245 [observing as to summer camp and its counselors, campers, and campers' parents that "[e]ven if a special relationship exists, a defendant's duty of care does not necessarily include the obligation to act proactively" as to possible future harm from third party].)

In determining whether policy considerations justify excusing or limiting a defendant's duty of care, we look to "'the foreseeability of harm to the plaintiff, the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, the policy of preventing future harm, the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach, and the availability, cost, and prevalence of insurance for the risk involved.'" (*Regents, supra*, 4 Cal.5th at p. 628, quoting *Rowland, supra*, 69 Cal.2d at p. 113; accord, *Vasilenko, supra*, 3 Cal.5th at p. 1083 [church did not owe duty of care to protect plaintiff from being struck by car as he crossed public street from church's parking lot to the church].)

"The *Rowland* factors fall into two categories.  The first group involves foreseeability and the related concepts of certainty and the connection between plaintiff and defendant.  The second embraces the public policy concerns of moral blame, preventing future harm, burden, and insurance availability."  (*Regents, supra*, 4 Cal.5th at p. 629; accord, *Vasilenko, supra*, 3 Cal.5th at p. 1083.)  "These factors must be 'evaluated at a relatively broad level of factual generality.'  [Citation.]  In considering them, we determine 'not whether they support an exception to the general duty of reasonable care on the facts of the particular case before us, but whether carving out an entire category of cases from that general duty rule is justified by clear considerations of policy.'"  (*Regents*, at pp. 628-629; accord, *Vasilenko*, at p. 1083.)

a.  *Foreseeability factors*

In determining whether to create an exception to the general duty to exercise ordinary care, the most important factor is whether the injury at issue was foreseeable.  (*Regents, supra*, 4 Cal.5th at p. 629.)  "In examining foreseeability, 'the court's task . . . "is not to decide whether a *particular* plaintiff's injury was reasonably foreseeable in light of a *particular* defendant's conduct, but rather to evaluate more generally whether the category of negligent conduct at issue is sufficiently likely to result in the kind of harm experienced that liability may appropriately be imposed . . . .""'  (*Ibid.*, quoting *Cabral v. Ralphs Grocery Co.* (2011) 51 Cal.4th 764, 772.)  The *Regents* court explained the appropriate question in that case was not whether it was foreseeable a particular student would stab another student in the classroom, but rather, "whether a reasonable university could foresee that its negligent failure to control a

24

potentially violent student, or to warn students who were foreseeable targets of his ire, could result in harm to one of those students." (*Regents*, at p. 629.) The Supreme Court considered instances in which individuals at other universities committed unprovoked violent attacks and observed, "[P]articularly after the Virginia [Polytechnic Institute and State University] shootings focused national attention on the issue, colleges have been alert to the possibility that students, particularly those with mental health issues, may lash out violently against those around them." (*Id*. at p. 630.) The court concluded, "[C]ase-specific foreseeability questions are relevant in determining the applicable standard of care or breach in a particular case. They do not, however, inform our threshold determination that a duty exists." (*Ibid*.)[10]

---

[10] USAT relies on cases predating *Regents*, in which the courts concluded an entity or individual having a special relationship with a minor did not owe the minor a duty of care because the conduct of the third party who harmed the minor was not foreseeable. (See, e.g., *J.L. v. Children's Institute, Inc.* (2009) 177 Cal.App.4th 388, 391, 393, 396 [daycare agency had special relationship with child but "owed no duty to protect [child] against an unforeseeable criminal assault" by 14-year-old grandson of home daycare operator]; *Margaret W. v. Kelley R.* (2006) 139 Cal.App.4th 141, 152 [mother hosting sleepover had special relationship with daughter's friend but no duty to prevent rape that was not foreseeable where daughter and friend left home without parents' permission]; *Romero v. Superior Court* (2001) 89 Cal.App.4th 1068, 1080-1081, 1089 [parents had special relationship with 13-year-old girl whom they invited to visit with their teenage son, but they did not owe duty of care to prevent other teenage boy from assaulting girl where the parents were unaware of the boy's propensity to sexually assault a female minor]; *Chaney v. Superior Court* (1995) 39 Cal.App.4th 152, 157

25

Here, plaintiffs allege in 1992 the USAT national team coach was caught having sex with a young female Olympian, and sexual abuse of youth athletes by credentialed coaches "was so rampant that by 1999 defendant USOC required all [national governing bodies] to have specific insurance to cover coach sexual abuse."  USAT purchased this insurance in 1999.  Further, plaintiffs allege that at some time prior to 2005 and again in 2007 female USAT youth athletes were raped at the Olympic training center in Colorado Springs.  Plaintiffs allege USAT "regularly received complaints from athletes or their parents regarding improper sexual conduct by coaches," and it was "aware that female taekwondo athletes, and Olympian level athletes in general were frequently victims of sexual molestation by their coaches yet did nothing to protect these athletes from such abuse."  In addition, plaintiffs allege "[b]y 2007 sexual abuse of minors by figures of authorities, like priests, coaches, and scout leaders was a widely known risk in American society."

Based on these allegations, it was foreseeable youth athletes attending Olympic qualifying competitions with their coaches might be sexually molested by their coaches, regardless of whether USAT had knowledge of prior sexual misconduct by

["where a child is sexually assaulted in the defendant wife's home by her husband, the wife's duty of reasonable care to the injured child depends on whether the husband's behavior was reasonably foreseeable"].)  Although some of these cases analyze the question of duty in the context of foreseeability of the particular tortfeasor causing harm, we follow the Supreme Court's direction to analyze foreseeability under *Rowland* at a general level, considering whether it was foreseeable the category of negligent conduct was likely to result in the type of harm experienced.  (*Regents, supra,* 4 Cal.5th at p. 629.)

26

Gitelman. (See *United States Youth Soccer, supra*, 8 Cal.App.5th at pp. 1132, 1135 [even though soccer associations were not aware of coach's prior sexual abuse, sexual abuse of minors in soccer program by their coach was reasonably foreseeable because the associations "were aware that sexual predators were drawn to their organization in order to exploit children and that there had been prior incidents of sexual abuse of children in their programs"]; *Juarez, supra*, 81 Cal.App.4th at p. 404 ["[I]t should be reasonably foreseeable to the Scouts that a child participating in scouting might fall prey to a sexual predator, with no documented history of such proclivities, who is serving as an adult volunteer in the child's scouting troop."].)

Moreover, plaintiffs allege Gitelman sexually abused Bordon on a road trip while they were alone in a car, and he abused all three plaintiffs in his hotel and dormitory rooms during overnight trips to taekwondo competitions. It is reasonably foreseeable some coaches, allowed to be alone with youth athletes, would sexually abuse the athletes during road trips and overnight stays. (See *City of Murrieta, supra,* 102 Cal.App.4th at p. 915 [plaintiffs' frequent participation in one-on-one ride-alongs with police adviser late at night "created a risk or foreseeability that [adviser] would become sexually involved with plaintiffs"]; *Juarez, supra*, 81 Cal.App.4th at p. 404 ["[C]hildren engaged in organized group overnight activities are at risk of foreseeable sexual abuse."].)

The second factor, the degree of certainty that plaintiffs suffered harm, is not at issue. It is undisputed plaintiffs suffered harm from Gitelman's sexual abuse of them. "The significant emotional trauma caused by childhood sexual abuse, with its related societal costs, is well documented . . . ." (*Juarez, supra*,

27

81 Cal.App.4th at p. 405; accord, *City of Murrieta, supra*, 102 Cal.App.4th at p. 916 [rejecting argument plaintiffs did not suffer injury because they consented to sexual acts].)

"The third factor is 'the *closeness of the connection* between the defendant's conduct and the injury suffered.' [Citation.] 'Generally speaking, where the injury suffered is connected only distantly and indirectly to the defendant's negligent act, the risk of that type of injury from the category of negligent conduct at issue is likely to be deemed unforeseeable. Conversely, a closely connected type of injury is likely to be deemed foreseeable.'" (*Regents, supra*, 4 Cal.5th at pp. 630-631; accord, *Cabral, supra*, 51 Cal.4th at p. 779.)

Plaintiffs allege USAT was negligent in failing to adopt and enforce policies and procedures to protect athletes from sexual abuse by coaches. Specifically, they allege although USAT was aware as early as 1992 that coaches were sexually abusing taekwondo athletes, it did not adopt policies to prevent sexual abuse until the late summer of 2013—after Gitelman sexually abused plaintiffs. USAT's failure to take any steps prior to 2013 to prevent taekwondo coaches from sexually abusing female athletes is closely connected to the injury plaintiffs suffered because action by USAT could have reduced the risk of plaintiffs being abused by limiting inappropriate contact between coaches and youth athletes. (See *Regents, supra*, 4 Cal.5th at p. 631 ["When circumstances put a school on notice that a student is at risk to commit violence against other students, the school's failure to take appropriate steps to warn or protect foreseeable victims can be causally connected to injuries the victims suffer as a result of that violence."]; *United States Youth Soccer, supra*, 8 Cal.App.5th at pp. 1136-1137 ["If defendants had conducted a

28

criminal background check of [the coach], his prior conviction for domestic violence would have been discovered and it would have been highly unlikely that he would have been hired. Thus, he would have had far fewer, if any, opportunities to sexually abuse plaintiff."]; *Conti, supra*, 235 Cal.App.4th at p. 1235 [allowing child molester to be alone with plaintiff during field service heightened risk of sexual abuse]; *City of Murrieta, supra*, 102 Cal.App.4th at p. 916 ["Had the [police department] restricted plaintiffs' contact with [their adviser] while on the job, . . . it would have been much less likely that plaintiffs and [their adviser] would have become sexually involved."]; *Juarez, supra*, 81 Cal.App.4th at p. 406 [Boy Scouts' failure to educate scouts, their parents, and adult volunteers to protect scouts from sexual abuse created "a sufficient causal link between the acts or omissions of the [Boy] Scouts and the harm [plaintiff] suffered."].)

b.     *Policy factors*

The existence of a duty also depends on "'"'a weighing of policy considerations for and against imposition of liability.'"'" (*Vasilenko, supra*, 3 Cal.5th at p. 1086; accord, *Regents, supra*, 4 Cal.5th at p. 631 ["Although *Rowland*'s foreseeability factors weigh in favor of recognizing a duty of care, we must also consider whether public policy requires a different result."].) "'A duty of care will not be held to exist even as to foreseeable injuries . . . where the social utility of the activity concerned is so great, and avoidance of the injuries so burdensome to society, as to outweigh the compensatory and cost-internalization values of negligence liability.'" (*Regents*, at p. 631; accord, *Vasilenko*, at pp. 1086-1087.)

"[I]f there were reasonable ameliorative steps the defendant could have taken, there can be moral blame 'attached to the defendants' failure to take steps to avert the foreseeable harm.'" (*Vasilenko, supra*, 3 Cal.5th at p. 1091; see *Regents, supra*, 4 Cal.5th at p. 631 ["[s]ome measure of *moral blame* does attach to a university's negligent failure to prevent violence against its students" because college had superior knowledge about potential threats and ability to control the environment]; *City of Murrieta, supra*, 102 Cal.App.4th at p. 916 [police department, as sponsor of explorer program, "had a moral obligation to protect its explorers, including implementing reasonable rules and restrictions . . . and intervening when there was an apparent risk of sexual exploitation by an explorer adviser"]; cf. *United States Youth Soccer, supra*, 8 Cal.App.5th at p. 1137 [no moral blame attributable to defendants where there was no evidence they knew the coach would harm plaintiff, and defendants required applicants to disclose and verify record of prior criminal convictions]; *Juarez, supra*, 81 Cal.App.4th at pp. 406-407 [Boy Scouts' failure to ensure scouts, parents, and volunteers were aware of potential for sexual abuse was not blameworthy where the Boy Scouts were in the vanguard in fighting child sexual abuse by their development of an educational program].) Here, as in *Regents*, we attribute "[s]ome measure of *moral blame*" to USAT because it failed to take action to prevent sexual abuse by coaches until the late summer of 2013, when it first adopted a safe sport program. (*Regents*, at p. 631.)

We also consider the policy of preventing future harm, which "'is ordinarily served, in tort law, by imposing the costs of negligent conduct upon those responsible. The policy question is whether that consideration is outweighed, for a category of

30

negligent conduct, by laws or mores indicating approval of the conduct or by the undesirable consequences of allowing potential liability.'" (*Regents, supra*, 4 Cal.5th at p. 632 [finding of duty served policy of preventing future harm because imposing a duty would create incentives that "[o]n the whole . . . avert violent episodes"]; cf. *Vasilenko, supra*, 3 Cal.5th at p. 1087 [factor weighed against finding duty because landowner has limited ability to reduce risk of injury from the public crossing public street to parking lot, and imposing duty could cause landowner to stop providing parking].)

Here, the societal goal of safeguarding youth athletes from sexual abuse weighs in favor of imposing a duty on USAT to implement and enforce policies and procedures to protect the athletes.  USAT is in the best position to take steps to protect youth athletes who attend Olympic taekwondo competitions alone with their coaches.  As the *Juarez* court observed, society's "common goal of safeguarding our children . . . is gravely threatened by sexual predators who prey on young children. . . . [¶]  . . . The interests of the state in protecting the health, emotional welfare and well-rounded growth of its young citizens, together with its undeniable interest in safeguarding the future of society as a whole, weigh strongly in favor of imposing a duty . . . ." (*Juarez, supra*, 81 Cal.App.4th at p. 407; accord, *United States Youth Soccer, supra*, 8 Cal.App.5th at p. 1137 ["[O]ur society recognizes that the protection of children from sexual abuse is a paramount goal."]; *City of Murrieta, supra*, 102 Cal.App.4th at p. 916 ["preventing future harm to minors is certainly appropriate and could be accomplished by implementing the protective measures stated in the . . . explorer handbook, as

31

well as adhering to [the defendant's] own ride-along restrictions"].)

We also consider "the *burden* that recognizing a tort duty would impose on the defendant and the community." (*Regents, supra*, 4 Cal.5th at p. 633; accord, *Vasilenko, supra*, 3 Cal.5th at p. 1090.) Incentivizing USAT to adopt policies that adequately protect youth athletes and to ensure the policies are followed would not impose a substantial burden on USAT. USAT has now enacted codes of conduct and ethics that prohibit sexual relationships and inappropriate touching between coaches and athletes. Further, USAT has a disciplinary procedure for barring coaches from coaching taekwondo if they violate USAT's policies and procedures. Although USAT delayed taking action against Gitelman, it banned him from coaching Olympic taekwondo in September 2015. (See *United States Youth Soccer, supra*, 8 Cal.App.5th at pp. 1135-1136 [imposing a duty to implement criminal background checks for coaches was not burdensome for national and local soccer associations]; *Conti, supra*, 235 Cal.App.4th at p. 1235 ["Defendants will not be heavily burdened by a duty to take reasonable care to ensure that molesters are accompanied by another adult, and no children, in the field."]; *City of Murrieta, supra*, 102 Cal.App.4th at p. 916 [implementation of protective measures stated in the explorer handbook and enforcement of defendant's own ride-along restrictions were not "unduly burdensome or costly"]; *Juarez, supra*, 81 Cal.App.4th at pp. 407-409 [burden on Boy Scouts was not onerous where delivery system was "already in place to see that vital information needed to combat child sexual abuse is communicated at every level of scouting"].)

The final *Rowland* factor is the availability and cost of insurance for the risk involved.  (*Regents, supra*, 4 Cal.5th at p. 633; *Vasilenko, supra,* 3 Cal.5th at p. 1091.)  This factor weighs in favor of finding a duty in light of the allegation USAT in 1999 obtained insurance to cover sexual abuse by coaches.

In sum, on the facts as alleged, the *Rowland* factors support recognition of USAT's duty to use reasonable care to protect taekwondo youth athletes from foreseeable sexual abuse by their coaches.

4. *Plaintiffs have not alleged facts showing USOC had a special relationship with Gitelman or plaintiffs*

Plaintiffs contend USOC had a special relationship with Gitelman or plaintiffs because USOC had authority to certify or decertify national governing bodies, including USAT; USOC mandated national governing bodies adopt a safe sport program by 2013; and Gitelman's sexual abuse of plaintiffs occurred at taekwondo competitions sanctioned by USOC.  These allegations show USOC had the ability to regulate USAT's conduct, but they do not establish that USOC had the ability to control Gitelman's conduct, or USOC was in the best position to protect plaintiffs from Gitelman's sexual abuse.  (*Regents, supra*, 4 Cal.5th at p. 621; see *Barenborg, supra*, 33 Cal.App.5th at p. 80 ["Absent an ability to monitor the day-to-day operations of local chapters, the authority to discipline generally will not afford a national fraternity sufficient ability to prevent the harm and thus will not place it in a unique position to protect against the risk of harm."]; *University of Southern California v. Superior Court* (2018) 30 Cal.App.5th 429, 449 [college did not have special relationship with students or guests attending off-campus party at fraternity

33

because "college has little control over such noncurricular, off-campus activities, and it would be unrealistic for students and their guests to rely on the college for protection in those settings"].)  USOC's indirect control over Gitelman through its regulation of USAT is too remote to create a special relationship.

Plaintiffs liken USOC to the national youth soccer association that the Court of Appeal in *United States Youth Soccer, supra*, 8 Cal.App.5th at page 1131 concluded had a special relationship with a youth athlete playing for a local affiliated soccer league.  As here, the national association established policies to protect youth athletes from sexual abuse by coaches. (*Id*. at pp. 1123-1124.)  But the national association also set requirements for the hiring of coaches by its state associations and regional affiliates, required state associations and their affiliates to collect and screen criminal conviction information on their coaches, had authority to deny certification to coaches with criminal convictions, and distributed monthly reports showing which coaches had been disqualified from coaching because of their convictions.  (*Id*. at p. 1126.)  Further, unlike here, the plaintiff was a member of the national association and played on a team that was a local affiliate of the national association.  (*Id*. at p. 1131.)

*Conti*, *City of Murrieta*, and *Juarez* are similarly distinguishable.  In *Conti, supra*, 235 Cal.App.4th at page 1235, the church elders controlled the field service program during which a church member sexually molested the plaintiff.  In *City of Murrieta, supra*, 102 Cal.App.4th at page 918, the police department sponsored the explorer program and controlled the adviser who sexually abused the teenage explorers.  In *Juarez, supra*, 81 Cal.App.4th at pages 398 to 400, the Boy Scouts

34

developed educational materials on sexual abuse and set guidelines for scouting troops to follow, but it failed to provide the educational materials to the minor plaintiff and his parents in their native language.

Here, USAT is one of 49 national governing bodies in the United States. Plaintiffs have not alleged any relationship between USOC and Gitelman other than USOC's ability to control the policies adopted by USAT, which in turn would impact the conduct of coaches registered with USAT. Unlike *United States Youth Soccer*, plaintiffs have not alleged USOC had any authority to control Gitelman's conduct directly or to prevent him from coaching taekwondo in competitions. Similarly, the first amended complaint does not allege any relationship between USOC and plaintiffs, other than an allegation plaintiffs were abused at taekwondo events "sanctioned" by USOC. This alone does not establish a special relationship between USOC and plaintiffs, or that USOC was in a position to control Gitelman's conduct. The fact USOC was aware generally of coaches sexually abusing athletes in Olympic sports, including taekwondo, leading USOC to require national governing bodies to adopt safe sport policies, does not mean USOC had the ability to control Gitelman's conduct or was in the best position to do so. Further, plaintiffs have not provided additional facts they could allege to show a special relationship between USOC and Gitelman or plaintiffs.[11]

---

[11] On September 12, 2018 plaintiffs requested judicial notice of two May 21, 2018 congressional staff memoranda and a videotape of a May 23, 2018 congressional hearing concerning the sexual abuse of athletes in Olympic sports, including taekwondo. We denied plaintiffs' request without prejudice because it failed

Because USOC does not have a special relationship with Gitelman or plaintiffs, it does not have a duty to protect plaintiffs. Therefore, we do not consider the *Rowland* factors as to USOC. (*Barenborg, supra*, 33 Cal.App.5th at p. 77 ["Because . . . we conclude no exception applies here, we need not consider the application of the *Rowland* factors to the facts of this case."]; *University of Southern California v. Superior Court, supra*, 30 Cal.App.5th at p. 451 ["An analysis of the *Rowland* factors may be unnecessary if the court determines as a matter of law based on other policy considerations that no duty exists in a category of cases."].)

---

to comply with California Rules of Court, rule 8.252(a)(2). On August 26, 2019 plaintiffs renewed their request for judicial notice of the same information. We deny plaintiffs' renewed request for judicial notice on the basis the documents and videotape are not necessary for our resolution of the appeal because USOC's knowledge of sexual abuse by Olympic coaches is not sufficient to create a special relationship with taekwondo coaches or athletes. (See *Jordache Enterprises, Inc. v. Brobeck, Phleger & Harrison* (1998) 18 Cal.4th 739, 748, fn. 6 [judicial notice denied where "the requests present no issue for which judicial notice of these items is necessary, helpful, or relevant"]; *Appel v. Superior Court* (2013) 214 Cal.App.4th 329, 342, fn. 6 [judicial notice denied where materials are not "relevant or necessary" to the court's analysis].) However, we deny USOC's and USAT's motions to strike the portions of plaintiffs' reply brief that reference the documents attached to their request for judicial notice. Instead, we have not considered the cited May 2018 congressional testimony in our analysis.

36

C.  *Plaintiffs Have Not Alleged Sufficient Facts To Support Their Claims Against USOC and USAT Based on Vicarious Liability*

Plaintiffs base their claims for negligence (fourth cause of action), the negligent hiring and retention of Gitelman (sixth cause of action), the intentional infliction of emotional distress (seventh cause of action), and the negligent infliction of emotional distress (eighth cause of action) on alternative theories of joint venture, agency, and an employment relationship.  Plaintiffs have not alleged facts sufficient to state a claim under any of these theories.

1.  *Plaintiffs have not alleged a joint venture among Gitelman, USAT, and USOC*

Plaintiffs base their fourth cause of action for negligence in part on their allegation Gitelman's conduct was in furtherance of a joint venture among the defendants.  "'There are three basic elements of a joint venture: the members must have joint control over the venture (even though they may delegate it), they must share the profits of the undertaking, and the members must each have an ownership interest in the enterprise.'"  (*Scottsdale Ins. Co. v. Essex Ins. Co.* (2002) 98 Cal.App.4th 86, 91; accord, *Chambers v. Kay* (2002) 29 Cal.4th 142, 151 ["'[A] joint venture exists where there is an "agreement between the parties under which they have a community of interest, that is, a joint interest, in a common business undertaking, an understanding as to the sharing of profits and losses, and a right of joint control."'"]; *Orosco v. Sun-Diamond Corp.* (1997) 51 Cal.App.4th 1659, 1666.)

""'An essential element of a partnership or joint venture is the right of joint participation in the management and control of

37

the business.  [Citation.]  Absent such right, the mere fact that one party is to receive benefits in consideration of services rendered or for capital contribution does not, as a matter of law, make him a partner or joint venturer.”’” (*Simmons v. Ware* (2013) 213 Cal.App.4th 1035, 1056; accord, *Kaljian v. Menezes* (1995) 36 Cal.App.4th 573, 586.)

Plaintiffs allege USOC, USAT, and Gitelman “were engaged in a joint venture/enterprise to promote and profit from the sport of taekwondo and to train American athletes to win medals in Olympic and other international competitions. Plaintiffs are informed and believe that these defendants made loans and other monetary contributions to the other members of the venture/enterprise, paid for advertising and other expenses for the benefit of the venture/enterprise and/or had representatives on the various boards of directors for the defendants who had a voice in the decisions of the members of the venture/enterprise and had a right of control in directing the conduct of the enterprise.”

Plaintiffs fail to allege the essential element of an agreement among Gitelman, USOC, and USAT to share in the profits and losses of the alleged joint venture.  (See *Simmons v. Ware, supra*, 213 Cal.App.4th at pp. 1055-1056 [no joint venture where there was no agreement to share in profits and losses, even though defendant had some control over the venture]; *Orosco v. Sun-Diamond Corp., supra*, 51 Cal.App.4th at p. 1666 [defendant agricultural cooperative was not engaged in joint venture with plaintiff’s employer to run raisin plant where the cooperative did not control or operate plant or share in profits].)  Further, plaintiffs do not allege Gitelman had “the right of joint participation in the management and control of the business.”

(*Simmons*, at p. 1056.)  Rather, they only allege on information and belief USOC and USAT contributed money to the enterprise, paid for expenses, and generally "'"had a right of control in directing the conduct of the enterprise."'"  Plaintiffs assert they can amend their complaint to allege the nature of the joint venture relationship and the roles Gitelman, USOC, and USAT played in the venture.  But plaintiffs have failed to set forth specific facts they could allege to support a finding Gitelman shared in the profits or had a right of control over the asserted joint venture.  Therefore, the trial court did not abuse its discretion in denying plaintiffs leave to amend to allege derivative liability based on a joint venture.

2. *Plaintiffs have not adequately alleged Gitelman was an agent of USOC or USAT*

Plaintiffs alternatively base their fourth cause of action for negligence, as well as their seventh and eighth causes of action for the intentional and negligent infliction of emotional distress, on Gitelman's alleged status as an agent of USOC and USAT.  "'"Agency is the relationship which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act.' [Citation.]  'The principal must in some manner indicate that the agent is to act for him, and the agent must act or agree to act on his behalf and subject to his control.'"'"  (*Secci v. United Independent Taxi Drivers, Inc.* (2017) 8 Cal.App.5th 846, 855; accord, *Barenborg, supra*, 33 Cal.App.5th at p. 85 [local fraternity chapter did not act as agent of national fraternity].)  "'"The chief characteristic of the agency is that of representation, the authority to act for and in the place of the

39

principal for the purpose of bringing him or her into legal relations with third parties.""""" (*Castillo v. Glenair, Inc.* (2018) 23 Cal.App.5th 262, 277; accord, *Daniels v. Select Portfolio Servicing, Inc.* (2016) 246 Cal.App.4th 1150, 1171.)

"'A principal who personally engages in no misconduct may be vicariously liable for the tortious act committed by an agent within the course and scope of the agency.'" (*Barenborg, supra*, 33 Cal.App.5th at p. 85; accord, *Secci v. United Independent Taxi Drivers, Inc., supra*, 8 Cal.App.5th at p. 855.) Moreover, a principal is liable to a third party harmed by an agent's conduct when the principal later ratifies the agent's conduct. (*Rakestraw v. Rodrigues* (1972) 8 Cal.3d 67, 73; *Dickinson v. Cosby* (2019) 37 Cal.App.5th 1138, 1158.) "Ratification is the voluntary election by a person to adopt in some manner as his own an act which was purportedly done on his behalf by another person, the effect of which, as to some or all persons, is to treat the act as if originally authorized by him." (*Rakestraw*, at p. 73; accord, *Dickinson*, at p. 1158.)

An allegation of agency constitutes an averment of ultimate fact, which we accept as true on a demurrer. (*Skopp v. Weaver* (1976) 16 Cal.3d 432, 437; *City of Industry v. City of Fillmore* (2011) 198 Cal.App.4th 191, 212; *Blickman Turkus, LP v. MF Downtown Sunnyvale, LLC* (2008) 162 Cal.App.4th 858, 886.) But where factual allegations are based on information and belief, the plaintiff must allege "information that 'lead[s] [the plaintiff] to believe that the allegations are true.'" (*Doe v. City of Los Angeles* (2007) 42 Cal.4th 531, 551, fn. 5 [plaintiffs failed adequately to allege city and its police department were on notice of police officer's prior unlawful sexual conduct, noting plaintiff could not plausibly allege the city or police department withheld

or concealed evidence of their knowledge or notice]; accord, *Gomes v. Countrywide Home Loans, Inc.* (2011) 192 Cal.App.4th 1149, 1158-1159 [trial court properly denied leave to amend because plaintiff had no information to support allegations on information and belief as to assignments of note].)

Here, plaintiffs allege on information and belief Gitelman was an agent of USOC and USAT, but they fail to allege any information that led them to believe he acted as USOC's and USAT's agent.[12] On appeal, plaintiffs point to their allegations USOC certified USAT as a national governing body, USOC exercised control over USAT by requiring adoption of policies and procedures, and USOC had authority to place USAT on probation. As to USAT, plaintiffs point to their allegations USAT is the national governing body for taekwondo, it formulates policies and procedures governing local taekwondo coaches, and it requires athletes to be members of USAT and to train under USAT-registered coaches. These allegations show USOC was able to exercise control over USAT, and USAT in turn could exercise control over Gitelman. But the allegations do not establish how USOC and USAT granted Gitelman """"authority to

---

[12] Plaintiffs allege in their general allegations Gitelman was an agent of USOC and USAT; he acted within the scope of his authority as an agent; and USOC and USAT ratified his tortious and unlawful activities. However, the specific allegations assert only upon information and belief Gitelman was acting as an agent of USOC and USAT. As discussed, the specific allegations based on information and belief control over the general allegation Gitelman acted as an agent for USOC and USAT. (*Ferrick v. Santa Clara University, supra*, 231 Cal.App.4th at p. 1352; *Perez v. Golden Empire Transit Dist., supra*, 209 Cal.App.4th at p. 1236.)

41

act for and in the place of the principal for the purpose of bringing him or her into legal relations with third parties."'"" (*Castillo v. Glenair, Inc., supra*, 23 Cal.App.5th at p. 277; accord, *Daniels v. Select Portfolio Servicing, Inc., supra*, 246 Cal.App.4th at p. 1171.)

In seeking leave to amend the complaint, plaintiffs have not set forth facts they could allege to show an agency relationship.  Thus, the trial court did not abuse its discretion in denying leave to amend as to the derivative claims based on Gitelman's purported agency relationship with USOC or USAT.

3. *Plaintiffs have not adequately alleged an employment relationship between Gitelman and either USOC or USAT*

Plaintiffs also base their claims for negligence, negligent and intentional infliction of emotional distress, and the negligent hiring or retention of Gitelman on his alleged status as an employee of USOC and USAT.  Under the respondeat superior doctrine, "'an *employer* may be held vicariously liable for torts committed by an employee within the scope of employment.'" (*Patterson v. Domino's Pizza, LLC* (2014) 60 Cal.4th 474, 491; accord, *Lisa M. v. Henry Mayo Newhall Memorial Hospital* (1995) 12 Cal.4th 291, 296.)  "Under certain circumstances, the employer may be subject to this form of vicarious liability even for an employee's willful, malicious, and criminal conduct." (*Patterson*, at p. 491; accord, *Lisa M.*, at pp. 296-297.)  "To be within the scope of employment, the incident giving rise to the injury must be an outgrowth of the employment, the risk of injury must be inherent in the workplace, or typical of or broadly incidental to the employer's enterprise." (*Torres v. Parkhouse*

42

*Tire Service, Inc.* (2001) 26 Cal.4th 995, 1008; accord, *Lisa M.*, at
p. 298.) "[A] sexual tort will not be considered engendered by the
employment unless its motivating emotions were fairly
attributable to work-related events or conditions." (*Lisa M.*, at
p. 301; accord, *City of Murrieta, supra*, 102 Cal.App.4th at p. 907
["The focus is on whether the assault arose out of the exercise of
job-created law enforcement authority over the plaintiff, not
whether the officer's activity was characteristic or foreseeable."];
see *Farmers Ins. Group v. County of Santa Clara* (1995)
11 Cal.4th 992, 1006 ["except where sexual misconduct by on-
duty police officers against members of the public is involved . . . ,
the employer is not vicariously liable to the third party for such
misconduct"].)

In addition, "an employer may be liable to a third party for
negligently hiring or retaining an unfit employee." (*J.W. v.
Watchtower Bible Tract Society of New York, Inc.* (2018)
29 Cal.App.5th 1142, 1163; accord, *Phillips v. TLC Plumbing,
Inc.* (2009) 172 Cal.App.4th 1133, 1139.) "Negligence liability
will be imposed on an employer if it 'knew or should have known
that hiring the employee created a particular risk or hazard and
that particular harm materializes.'" (*Phillips*, at p. 1139; accord,
*ZV v. County of Riverside* (2015) 238 Cal.App.4th 889, 903
[county not liable for negligent supervision of social worker where
county had no prior knowledge of social worker's propensity to
commit sexual assault]; *Juarez, supra*, 81 Cal.App.4th at pp. 395,
397 [Boy Scouts not liable for negligent hiring, supervision, and
retention of scoutmaster where they were not on notice
scoutmaster "posed an unreasonable risk to minors"].)

To support their derivative claims for negligence, negligent
hiring and retention, and the negligent and intentional infliction

of emotional distress, plaintiffs allege upon information and belief Gitelman was an employee of USOC and USAT and acted within the scope of his employment. But plaintiffs do not allege, as required, any information that led them to believe Gitelman was an employee of USOC or USAT. (*Doe v. City of Los Angeles, supra*, 42 Cal.4th at p. 551, fn. 5; *Gomes v. Countrywide Home Loans, Inc., supra*, 192 Cal.App.4th at pp. 1158-1159.) To the contrary, they allege Gitelman "owned and/or was employed by defendant NVT."

Moreover, in seeking leave to amend, plaintiff do not present facts they could allege to show an employment relationship with USOC or USAT. Thus, the trial court did not abuse its discretion in denying leave to amend the derivative claims based on Gitelman's purported employment relationship with USOC or USAT.

D. *Plaintiffs Have Not Alleged Facts Sufficient To State a Claim for the Intentional Infliction of Emotional Distress*

"A cause of action for intentional infliction of emotional distress exists when there is """(1) extreme and outrageous conduct by the defendant with the intention of causing, or reckless disregard of the probability of causing, emotional distress; (2) the plaintiffs' suffering severe or extreme emotional distress; and (3) actual and proximate causation of the emotional distress by the defendant's outrageous conduct.""" [Citations.] A defendants' conduct is 'outrageous' when it is so ""extreme as to exceed all bounds of that usually tolerated in a civilized community."" [Citation.] And the defendant's conduct must be ""intended to inflict injury or engaged in with the realization that injury will result.""" (*Hughes v. Pair* (2009) 46 Cal.4th 1035,

44

1050-1051, quoting *Potter v. Firestone Tire & Rubber Co.* (1993) 6 Cal.4th 965, 1001; accord, *Christensen v. Superior Court* (1991) 54 Cal.3d 868, 903.)

As to USOC's and USAT's direct liability, USAT's failure to adopt and implement adequate policies and procedures to prevent the sexual abuse of taekwondo athletes, and USOC's failure to require USAT to take prompt action to protect youth athletes, were not, as a matter of law, so """"extreme as to exceed all bounds of that usually tolerated in a civilized community."""" (*Hughes v. Pair, supra*, 46 Cal.4th at p. 1051.) To the extent USAT did not protect plaintiffs from Gitelman after learning in September 2013 of Brown's sexual abuse allegations, that could potentially support a claim against USAT for the intentional infliction of emotional distress. But plaintiffs have not alleged facts showing Gitelman continued to sexually abuse (or even coach) any of the plaintiffs after Gitelman's sexual abuse of Brown was disclosed to USAT in September 2013. Bordon and Gatt stopped competing in taekwondo events in 2010. Plaintiffs allege Gitelman stopped coaching Brown sometime in 2013, but have not alleged or asserted on appeal that Gitelman continued to coach Brown after she disclosed the sexual abuse and appeared at the October 2013 USAT ethics committee hearing. Moreover, plaintiffs do not explain how they could amend their complaint to allege additional facts to support this claim.

## DISPOSITION

We affirm the judgment of dismissal as to USOC. We reverse the judgment of dismissal as to USAT and remand for further proceedings consistent with this opinion. On remand, the

45

trial court should consider USAT's motion to strike, which it denied as moot.

USOC is entitled to recover its costs on appeal from plaintiffs. Plaintiffs are entitled to recover their costs on appeal from USAT.


FEUER, J.

WE CONCUR:


PERLUSS, P. J.


ZELON, J.